GENERAL FIRE EXTINGUISHER CO. v. MALLERS et al.

(Circuit Court of Appeals, Seventh Circuit. June 26, 1901.)

No. 757.

1. Patents—Automatic Fire Extinguisher—Novelty.

Freeman, to whom patent No. 415,166 for an improvement in automatic fire extinguishers was issued, was not the first to introduce the conception of a strut which, though composed of different members, was, as an entirety, separate from the environing framework; hence his claim on the score of separableness of the strut cannot be maintained.

110 F.—34

**2. SAME—CLAIM—DESCRIPTION.**

Where, in the claim for a patent for improvement in automatic fire extinguishers, no emphasis was placed on the idea of angular pivoting of the strut, and no grant on that score was either asked or allowed, an action for infringement of that feature cannot be maintained, since, though the court may go to the description to amplify a claim, it cannot, out of the mere descriptive portion, wholly create a claim.

**3. SAME—CHANGE OF CLAIM—LIMITATION OF PURPOSE.**

Where the original claim for a patent is rejected as infringing on a former patent, and the inventor modified the objectionable claim by inserting words specifying the purpose of the combination of parts therein, and on such modified claim the patent is allowed, such action of the patent office and his acquiescence therein should be held to limit the claim to such purpose.

Appeal from the Circuit Court of the United States for the Northern Division of the Northern District of Illinois.

The bill in the Circuit Court was to restrain infringement of Letters Patent No. 415,166, issued November 12, 1889, to John R. Freeman for an improvement in Automatic Fire Extinguishers. 110 Fed. 528.

The substantial portion of the Letters Patent, together with its drawings, is as follows:

"This invention has for its object to construct an automatic sprinkler to be used for the extinction of fires by sprinkling with water or other appropriate liquid which, prior to the occurrence of the fire, is retained in appropriate conduits or reservoirs,· the said sprinkler comprising a valve normally held closed by connections or supports, which are in part composed of easily-fusible material, and which under the action of undue heat will permit the said valve to open.

"The object of my present invention is to provide means for protecting the sprinkler against the action of corrosive vapors and to·prevent accumulation of dust or lint upon the working parts; also, to provide improved mechanism for holding the valve closed, which shall, while acting upon the valve with great force, yet exert but slight strain upon the fusible material; also, to provide convenient means for the renewal of the protector for the sprinkler; also, to provide simple means for assisting the valve in its movement from its seat; also, to provide other details of construction, to be hereinafter pointed out.

"Figure 1 shows in vertical section an automatic sprinkler embodying this invention, the yoke holding the operating parts being broken off; Fig. 2, a vertical section of the automatic sprinkler shown in Fig. 1, taken on the dotted line x x; Fig. 3, a horizontal section of the fusibly-united valve-support; Fig. 4, a side elevation of the fusibly-united valve-support, the parts being shown as separating to permit the valve to leave its seat; Figs. 5 and 6, details of a modified form of valve-support; and Fig. 7, a detail of the valve-support shown in Fig. 5, provided with fusibly-united clamping plates.

"The top plate A is provided centrally with an externally screw-threaded nipple C.

"The top plate A has formed upon its under side at the nipple C a valve-seat, against which is normally pressed a valve B, (shown as a flat plate,) loosely connected to the outer or free end of a flat spring Q, attached to the under side of the top plate A. The tendency of the spring Q is to move the valve away from its seat, so that after the said valve has been held closed against its seat for a long period of time the spring Q will assist in its removal. Attached to or formed integral with the top plate is a yoke K, which serves as a support for the operating parts. The yoke K is tapped to receive the screw-threaded plug I, having the conical end portion I', the shank of said plug·I between the conical end portion and its screw-threaded portion being made smooth and adapted to receive upon it the distributer J, said distributer bearing upon the yoke K, but rotating upon the plug I. This valve-support is composed of a post L and a bent lever M, the point where the lower end of the post L thrusts against the bent lever M being

out of line with the point where the lever M bears on its fulcrum I, so that the lever M is practically a lever of the second order, the thrust of L and reaction of I tending to cause L and M to separate, as shown in Fig. 4, the contacting faces also being offset from the supporting-points of the post and lever; but the greater the length of that arm of the bent lever M which is united to the post L by the fusible solder the less will be the strain on the uniting-solder, making the strain small in proportion to direct pressure exerted against the valve. Each bar L M is grooved or corrugated vertically upon its contacting side, so that when held together movement of one upon the other is prevented. The post and bar are held together by fusible material placed between them, and also by two clamping-plates N O, embracing them and extending a short distance beyond them at each side to present large contacting surfaces for the said clamping-plates, and the said clamping-plates are also joined by fusible material—such, for instance, as solder—as best shown in Fig. 3. The valve-support is placed beneath the valve B, the upper end of the post L bearing against the under side of the valve and the step or offset of the bar M resting on the end of the plug I. An internally-screw-threaded cap H, having a ring G placed loosely upon the shank thereof, is turned upon the screw-threaded end of the plug I, and the loose ring G is surrounded by a ring of paraffine, stearine, or other equivalent material, which is adapted to melt at a low temperature.

"A glass case or shell D incloses all the operating parts, it having at its lower end a neck M$^3$, which snugly fits and adheres to the paraffine ring F, and having its upper edge slightly tapered and adapted to enter a recess or groove E, which has been previously filled with paraffine or equivalent material.

"The shell D prevents access of dust and corrosive vapors to the operating parts, so that they cannot deteriorate or become injured in any way. The shell is made, preferably, of transparent glass, so as to permit the internal parts to be readily examined, and, moreover, being diathermous, it permits radiant heat to pass through it and begin to act on the fusibly-united valve-support L M; also, the external shell D retains any leakage which may possibly occur.

"On the occurrence of a dangerous rise of temperature the ring of easily-fusible material F loses its sustaining power, and the material in the groove E, also being softened, loses what little adhesiveness it possesses, thereby permitting the shell D to fall. The action of the heat next causes the easily-fusible solder or like material uniting the thin metallic clamping-plates N O, and also uniting the post and bar L M, to lose its strength, whereupon these parts separate and permit the valve B to fall, assisted, as above described, by the spring Q, and the water or other liquid issuing from the nipple C strikes the distributer J, revolving it by force, and thereby distributing the water.

"I preferably use paraffine or stearine for making the ring F, such material being non-corrosive and fusible at a temperature a little lower than that of ordinary fusible solder, such as is used in holding the valve-support L M; but it is obvious that the ring F might be made of ordinary fusible metal.

"In lieu of the paraffine or like material placed in the groove E, an elastic ring or washer may be used. I make the upper edge of the glass shell sharp in order that when this shell is forced into place by a slight pressure of the screw H the edge may cut into the material in the groove to a small extent, and thus make the sealing of the joint more secure.

"The proportions of the post forming the valve-support may be materially varied, and also the grooves or corrugations on the contacting faces or sides of the parts of the valve-support may be omitted, if desired; but by their employment the strain on the solder is reduced. I also preferably groove or corrugate the clamping-plates N O, as best shown in Fig. 3, the corrugations varying in width, so that the plates cannot be misplaced.

"By making the plates N O thin and of large area, as shown in Fig. 7, heat is quickly absorbed.

"I preferably cover the outer surface of the plates N O with a thin coating of lamp-black to thereby increase the rapidity with which it will absorb heat.

"It is obvious that the glass shell or case may be employed as an inclosing-case for the automatic sprinklers of various kinds now on the market, and

therefore do not desire to limit my invention to the combination therewith of the particular form of sprinkler herein shown.

"In practice it may be found that the fusibly-united plates N O, embracing the post and bar L M, may be in themselves sufficient to hold in place the valve, thereby omitting the fusible material between the contacting faces of the said post and bar.

"The object of the screw-threaded cap is to permit substituting a new glass case or cover for a broken one without displacing the valve."

The claims sued upon are the following:

3. "In an automatic fire-extinguisher, the valve and separable valve-support, combined with the separable clamping-plates to hold the parts of the valve-support in contact, said plates extending laterally and being fusibly connected beyond the said support, substantially as described."

5. "The combination, with the valve of an automatic fire-extinguisher, of the fulcrum I and the fusibly-united independent valve-support consisting of a post L and a bent lever M, one end of the post bearing against the valve, the other against the bent lever, the direction of thrust of said post against the lever being at one side of the fulcrum I, at a point lying between said fulcrum and the outer end of said lever, so as to tend to pull said outer end of lever M away from post L, substantially as described."

The principal patents relied upon as anticipations are as follows:

Letters Patent No. 277,481, issued to R. W. & F. Grinnell, May 15, 1883, for an Automatic Fire Extinguisher.

Letters Patent No. 388,905, issued September 4, 1888, to W. Neracher for an Automatic Fire Sprinkler.

Letters Patent No. 356,874, issued February 1, 1887, to W. Harkness for an Automatic Fire Extinguisher.

Letters Patent No. 305,663, issued September 23, 1884, to J. R. Brown for an Automatic Fire Extinguisher.

The substantial portion of the latter patent, with its drawings and first claim, is as follows:

"This invention has reference to an improvement in the construction of automatic fire-extinguishers; and it consists in the peculiar and novel device by which one or two outlets are closed, so as to resist the internal pressure, until, on the occurrence of a fire, the same are released by the action of heat on a fusible solder, as will be more fully set forth hereinafter.

"In automatic fire-extinguishers as heretofore constructed the parts which are secured together by a fusible solder to restrain the action of the extinguisher until the breaking out of a fire would melt the solder have been secured so that the strain on the soldered surface was on a line with such surface, so that on the partial yielding of the solder the surfaces commenced to slide on each other, and such sliding, if arrested, would cause the extinguisher to leak. To prevent this creeping, I employ the solder simply to hold the two parts together surface to surface, which, on the melting of the solder, will separate without any movement of the surfaces upon each other.

"Fig. 1 is a view of my improved automatic fire-extinguisher. Fig. 2 is a view of the same, partly in section.

"In the drawings, A is the inlet, provided with a screw-thread by means of which it is secured in the usual branch-fitting of the pipes placed in the building to be protected, and connected with the water-supply. B B are two branches, ending in the discharge-outlets C C, placed opposite each other, so that the two streams issuing from the outlets will impinge against each other, and thus disperse the water in a fine spray over a large area. D D are caps by which the outlets C C are closed. They are preferably provided with a packing-ring, to insure a tight joint, and are provided with the central indentation, d d, in which the device for securing the caps rests. This device consists of the round-ended cup E, the interior of which is screw-threaded, and which is provided with holes into which a pin may be inserted to turn the cup E; or it may be made square or polyangular, so that a wrench can be applied. Screwed into the cup E is the post F, provided with the shoulder f, which shoulder is concaved, so as to form a firm bearing for the post G, which is secured to the post F by solder, the upper end of the post G bearing against the cap D and resting in the cavity d. By holding the posts F G and turning the cap E in one direction the whole device is elongated, and the caps D D are forced against the outlets, while by turning in the opposite direction the same are loosened. As long as the posts F G are held together by solder, the device will resist the internal pressure on the caps D D; but as soon as the solder is weakened by heat the joint is torn apart by the upsetting of the post F. The surfaces soldered do not slide in the least on each other, but are torn asunder as soon as the joint is sufficiently weakened by heat.

"The device can be arranged to require a greater or less force to rupture the soldered joint by placing the post G at a greater or less angle with the post F. By this arrangement the caps D D are firmly held in place until the solder is weakened by heat, and the caps D D do not move in the slightest decree until the soldered joint is separated completely, thus preventing the possibility of a leak until the caps are entirely released and are removed by the internal pressure.

"Having thus described my invention, I claim as new and desire to secure by Letters Patent—

"1. In an automatic fire-extinguisher, the combination, with an extinguisher-body having oppositely-disposed discharge-openings and valves for said openings, of a separable holding-connection for the said valves, composed of two members interposed between each pair of the discharge-openings, and arranged in approximate alignment with such openings, the contiguous ends of said members being united by solder, and their opposite ends resting against the valves, substantially as described."

The substantial portion of Letters Patent No. 331,394, issued December 1, 1885, to A. M. Granger, with its drawings, is as follows:

"This invention relates to automatic sprinklers for the purpose of extinguishing fires; and it consists in the construction hereinafter set forth, whereby a rotary valve-distributer, while being used as a valve, is held off its pivotal support when not in operation, but is dropped to its support when the water is flowing; also in an improved construction of rotating sprayer or distributer; also in a non-fusible securing device which may be readily adjusted to hold the valve closed temporarily; also in details of construction, as hereinafter pointed out and claimed.

"The object of the invention is to produce an automatic sprayer, which may be quickly closed to stop water damage, temporarily held in closed position after a fire shall have been extinguished, and to improve the construction of the working parts.

"In the drawings, Figure 1 is a side elevation of the frame, nozzle, and lever, the lever being down and the sprayer removed. Fig. 2 is a similar elevation of the complete device as applied to the pipe. Fig. 3 is a vertical cross-section of the device, the rotating sprayer elevated in position to close the nozzle in full lines, but shown in depressed or rotating position in dotted lines. Fig. 4 is a top plan, and Fig. 5 a bottom plan, of the rotating sprayer or distributer.

"A indicates the nozzle, on which the frame B screws, as is usual in devices of this character, the frame being locked in position, when desirable, by set-screw C. The bottom of the frame bears a fixed spindle, D, of such length as to extend into the socket in the bottom of the rotating distributer E, when the latter is raised to bear against the nozzle, (see Fig. 3,) and having a conical top, which serves as a bearing for the rotation of said distributer when depressed.

"E is the rotating distributer, which has a hollow hub, F, on its lower face. When in its lowest position, this spindle will not quite reach the bar of the frame B. A lever, G, is pivoted near the bottom of the frame B, and has a cam-bearing surface, H. This lever may be a forked lever, having one prong at each side of the frame, or may be simply placed alongside the frame, as shown, in such position that the bearing surface H will, when the lever is raised, come against the bottom of the hub F, and lift the valve-distributer, but not far enough to lift it clear from the spindle D, which spindle thus serves as a guide. The frame B should have a projection or horn, I, which will receive one end of a fusible link, J. When lever G is turned up against the frame, the link J is slipped over the end thereof and over the horn I. The bearing H holds the spindle F up. The distributer-valve is held firmly against the nozzle, and, if properly constructed, leakage from the nozzle is impossible. On the fusing or breakage of link J the lever G falls and the distributer falls until it is supported only on the spindle D, where it can be rotated with very slight expenditure of power. The lever G has a non-fusible link or hook, K, attached. When the lever has fallen, it may be returned to closed position by pressing up with a stick or rod just below the link K. The fusible link having melted away link K will be folded over the horn I, and will hold the device closed; but before the fusible link can be applied the link K must be thrown back, and while the fusible link is in position it will be impossible to lock the device by the non-fusible attachment. The rotating distributer has spiral wings or vanes surrounding a central disk portion. The inner ends of these vanes are about on a level with the floor of the distributer, but gradually rise toward the periphery. The spiral construction causes the distributer to rotate with great rapidity when water is allowed to flow from the nozzle upon its face, the distributer being then depressed and resting on spindle D. The peculiar forms of the blades or vanes give an upward as well as an outward distribution to the water, throwing it off as a spray rather than spattering it in drops, as a fixed plate would do. As the blades of the distributer have no inner corners, any threads or fibers which may lodge thereon will be immediately washed off by the current of passing water."

Claim (3) of the Freeman patent, as originally filed (Claim 8), read as follows: "In an automatic fire extinguisher the valve and separable valve support, combined with the separable clamping plates, for the valve support, said plates extending laterally, beyond the said support, substantially as described."

This claim was rejected by the Patent Office, the Granger patent No. 331,394 being cited, and was then amended by Freeman to read as it now appears.

The following drawing illustrates, with sufficient definiteness, and accuracy, the device charged as an infringement.

In the Circuit Court the bill was dismissed for want of equity, on the ground of non-infringement, the court holding that, in view of the prior art, the appellant was entitled to no broad construction of the claims, and that the appellees' device did not come within the particular form of the Freeman patent. From this decree the appeal is prosecuted.

Wilmarth H. Thurston, for appellant.

L. M. Hopkins, for appellees.

Before WOODS, JENKINS, and GROSSCUP, Circuit Judges.

After the foregoing statement of the case, GROSSCUP, Circuit Judge, delivered the opinion of the Court, as follows:

Without going into the prior art, in full, it is enough to say that the Brown patent shows, in an automatic fire-extinguisher, a valve and separable valve support, combined with separable clamping plates, fusibly connected. Freeman was not the first to introduce into the art the conception of a strut which, though composed of different members was, as an entirety, separate from the environing framework. The claim, on the score of separableness of the strut, can not, therefore, be sustained.

But it was insisted at argument that neither the Brown device, nor any of the preceding fire extinguishers, show a strut, the members of which are set angularly to each other, and pivoted one upon the other. In the Brown device the convex end of one member of the strut fits into the concave shoulder of the other, and the drawings show that the pivoting is not out of alignment with the strut.

One of the chief difficulties of appellant's case is that its existence is not, strictly speaking, along the lines of the patent under which it claims; nor do the claims lay any emphasis upon the idea of angular pivoting. We may go to the description to amplify a claim, but we can not, out of the mere descriptive portion of the patent, wholly create a claim. Whether the feature of angularity, upon which so much stress is now laid, would have been sustained, had it appeared in the claim, need not be now considered. It is sufficient that, as a matter of fact, no grant, upon that score, was either asked or allowed.

We are of the opinion, also, that the action of the Patent Office, and Freeman's acquiescence therein, upon the original application constitute a limitation upon the Freeman claims. In view of the prior art, including the Granger patent, we can see no occasion for adding the words, "to hold the parts of the valve supports in contact" unless it was meant that the contact should be by a direct clamping, as shown in the drawings; for the Granger patent brings about an operative contact by clamping at some distance off; and it was to avoid this citation that the additional words were introduced. We can not escape the conclusion that a limitation such as this was intended; at least, that it was so understood by the Patent Office; and this interpretation excludes the appellees' device from the charge of infringement. .

The truth seems to be that present operative fire extinguishers—both those constructed by the appellant, and those constructed by the appellees—are, in the means leading to delicacy of adjustment, somewhat different from all the patents brought to our attention; and, if this difference be a step forward, it would be inequitable, by any strained construction, to bring this advance in the practical art within the monopoly of any of the patents that lag after.

The decree of the Circuit Court is, accordingly, affirmed.